**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**LDCIRCUIT, LLC,**

        **Plaintiff,**

        **v.**                      **Case No.  04-2327-JWL**

**SPRINT COMMUNICATIONS
COMPANY, L.P.,**

        **Defendant.**

_____

**MEMORANDUM AND ORDER**

Plaintiff LDCircuit, LLC filed this lawsuit against defendant Sprint Communications Company, L.P., seeking damages arising from Sprint's termination of LDCircuit as a sales agent. This matter is presently before the court on Sprint's motion to dismiss for lack of subject matter jurisdiction (doc. 14), in which Sprint argues that plaintiff's claims do not meet the $75,000 amount-in-controversy requirement necessary for this court to exercise diversity jurisdiction. On April 1, 2005, the court convened a hearing on this motion by telephone. At that time, the court preliminarily announced that it anticipated it would grant the motion and the court explained its reasons for that anticipated ruling. After allowing counsel to present additional argument on the matter, the court remains convinced that the motion should be granted. Accordingly, this case is dismissed for lack of subject matter jurisdiction.

## BACKGROUND

Sprint and LDCircuit entered into a Sprint Partner Program Sales Agent Agreement (the Agreement) effective December 1, 2001.   Under the Agreement, LDCircuit became a sales agent authorized to sell certain Sprint products and services.   In return, Sprint paid LDCircuit commissions based on the revenue that LDCircuit's customers generated for Sprint.   It appears that the parties worked well together until late 2002.   LDCircuit asserts that beginning in approximately November of 2002, Sprint failed to provide LDCircuit with needed sales support and assistance despite repeated requests from LDCircuit for information that it needed in order to finalize contracts with some of its customers.   This caused LDCircuit to lose contracts with at least three specific customers.

The Agreement was for an initial term of three years, but it gave Sprint the right to terminate the Agreement if LDCircuit failed to achieve certain specified commissionable revenue levels.   In a letter dated February 28, 2003, Sprint advised LDCircuit that it was terminating the Agreement effective March 8, 2003, due to LDCircuit's failure to achieve the required commissionable revenue levels.   The letter stated that commission payments would cease as of March 14, 2003.   LDCircuit contends that Sprint did not send this letter to the correct address and therefore LDCircuit did not receive the letter at that time.   In early April of 2003, Sprint began notifying LDCircuit's customers that LDCircuit would no longer be their Sprint representative and that they should work directly with Sprint from that point forward.   LDCircuit alleges that it did not learn that Sprint had purported to terminate the agreement until April 24, 2003.

2

LDCircuit filed this action in July of 2004, invoking this court's diversity jurisdiction. In this lawsuit, LDCircuit alleges that Sprint breached the Agreement in three principal respects. First, Sprint failed to provide LDCircuit with the sales support and assistance that LDCircuit needed in order to sell Sprint's services and this prevented LDCircuit from finalizing service contracts and hence earning commissions, and therefore Sprint was unjustified in terminating the Agreement based on LDCircuit's purported failure to achieve commissionable revenue requirements. Second, Sprint terminated the Agreement without justification because LDCircuit had, in fact, met the required commissionable revenue requirements. Third, Sprint was required to give LDCircuit a thirty-day cure period and then ten-days' notice of termination, but Sprint failed to do so because the February 28, 2003, letter was sent to the wrong address. LDCircuit also asserts a claim against Sprint for tortious interference with prospective business advantage on the grounds that Sprint intentionally thwarted LDCircuit's relationships with its customers.

Sprint now asks the court to dismiss plaintiff's complaint for lack of subject matter jurisdiction on the basis that this is a diversity case where the amount in controversy does not exceed $75,000. Sprint points out that the Agreement contained a provision limiting Sprint's liability to LDCircuit to one month's average commissions. This provision is at the heart of the parties' dispute regarding the amount in controversy and it is set forth in its entirety *infra*. Sprint submitted an affidavit in support of its motion which states that one month's average commissions is less than $75,000. In response, LDCircuit argues that, for a variety of reasons,

3

this limitation of liability provision does not effectively limit LDCircuit's recovery in this case. In addition, LDCircuit has submitted an affidavit which states that

> the amount of LDC's lost commissions alone resulting from Sprint's improper early termination of the Agreement exceeds $75,000. At the time of the termination of the Agreement, LDC was earning a recurring monthly commission of approximately $5,000. In addition, at the time of the termination of the Agreement, there were at least 21 months left under the three-year term of the Agreement. Also, the Agreement required Sprint to pay LDC its recurring monthly commission for an additional twelve months following termination of the Agreement for convenience, and LDC is entitled to recover this additional amount as well in this action.

LDCircuit also seeks to recover attorneys' fees pursuant to an indemnification provision in the Agreement. LDCircuit contends that, for these reasons, the $75,000 amount-in-controversy requirement is satisfied.

## LEGAL STANDARD FOR RULE 12(B)(1) MOTION TO DISMISS FOR FAILURE TO SATISFY AMOUNT-IN-CONTROVERSY REQUIREMENT

Federal courts have jurisdiction over civil actions where the parties are of diverse citizenship and the matter in controversy exceeds the sum or value of $75,000. 28 U.S.C. § 1332(a). Generally, "the amount claimed by the plaintiff controls if the claim is apparently made in good faith." *Adams v. Reliance Std. Life Ins. Co.*, 225 F.3d 1179, 1183 (10th Cir. 2000). "When federal subject matter jurisdiction is challenged based on the amount in controversy requirement, the plaintiffs must show that it does not appear to a legal certainty that they cannot recover at least [$75,000]." *Watson v. Blankinship*, 20 F.3d 383, 386 (10th Cir. 1994). Thus, here, LDCircuit has the burden of establishing jurisdiction. LDCircuit can

4

meet this burden "by demonstrating that it is not legally certain that the claim is less than the jurisdictional amount." *Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1216 (10th Cir. 2003). The legal certainty standard is very strict and dismissal is generally warranted "only when a contract limits the possible recovery, when the law limits the amount recoverable, or when there is an obvious abuse of federal court jurisdiction." *Id.* at 1216-17 (citing 14B Arthur Alan Wright et al., Federal Practice & Procedure § 3702, at 98-101 (3d ed. 1998)). Notwithstanding that language in *Woodmen of the World*, the Tenth Circuit has also made it clear, in a case decided less than two years earlier, that "there are cases where, even if diversity of citizenship exists, a federal court 'will not take jurisdiction [ ] unless the plaintiff has asserted a claim cognizable in the state courts.'" *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (quoting 13B Charles Alan Wright et al., Federal Practice & Procedure § 3602, at 375 (2d ed. 1984)).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) generally takes one of two forms: either a facial challenge or a factual challenge. *Id.* A party making a facial challenge attacks the allegations in the complaint regarding subject matter jurisdiction. *Id.* In evaluating a facial challenge, the court must treat the allegations in the complaint as true. *Id.* Alternatively, in a factual challenge a party may "go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction is based." *Id.* Here, Sprint chose to make a factual attack by offering an affidavit in support of its motion. *See, e.g.*, *id.* (holding a defendant who offered affidavits in support of its 12(b)(1) motion made a factual attack). In addressing a factual challenge, the court does not presume

5

the truthfulness of the factual allegations in the complaint and has "'wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts.'" *Id.* (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)).  In a factual attack under Rule 12(b)(1), the court's reference to evidence outside the pleadings does not convert the motion into a motion for summary judgment, *Stuart*, 271 F.3d at 1225, unless the jurisdictional question is intertwined with the merits of the case because subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case, *compare Holt*, 46 F.3d at 1003 (holding the district court properly considered evidence outside the pleadings without converting the motion into a Rule 56 motion where the jurisdictional issue of government immunity did not depend on the Federal Tort Claims Act which provided the substantive claims in the case), *with Wheeler v. Hurdman*, 825 F.2d 257, 260 (10th Cir. 1987) (holding the district court properly characterized 12(b)(1) motion as motion for summary judgment where determination of whether plaintiff qualified as an "employee" under the federal discrimination statutes was both a jurisdictional question and an aspect of the substantive claim).  Thus, the court will evaluate the motion by resolving disputed jurisdictional facts but it will not convert the motion to one for summary judgment.

## DISCUSSION

Essentially three different categories of damages are at issue in this case: (1) damages for Sprint's alleged breach of contract; (2) compensatory damages for Sprint's alleged tortious interference with LDCircuit's business advantage; and (3) attorneys' fees.  In order to satisfy

the amount-in-controversy requirement, it must appear to the court that the value of either the breach of contract claim or the tortious interference claim, combined with recoverable attorneys' fees on that particular claim, satisfies the amount in controversy. *See Watson*, 20 F.3d at 386 ("Every separate and distinct claim must individually meet the amount in controversy."). As explained below, the court finds that LDCircuit has failed to establish that it is not legally certain that it cannot recover more than $75,000 on either claim, and therefore the amount-in-controversy requirement is not satisfied in this case. Sprint's liability on the breach of contract claim is limited to one month's average commissions, which, based on the record currently before the court, appears to be approximately $5,000. LDCircuit's only colorable argument for circumventing this limitation of liability provision is its tortious interference claim, and that claim is so patently meritless as to negate LDCircuit's good faith in asserting the claim and LDCircuit has failed to provide a damage estimate on that claim in any event. Lastly, LDCircuit has failed to provide the court with a good faith estimate that it would be able to recover sufficient attorneys' fees on either count. Accordingly, the court will dismiss this case for lack of subject matter jurisdiction for failure to satisfy the $75,000 amount-in-controversy requirement.

## I.     **Breach of Contract Claim**

Sprint contends that the amount in controversy on LDCircuit's contract claim is insufficient to meet the jurisdictional requirement because the parties' Agreement contains a limitation of liability provision which limits LDCircuit's recovery to one month's average commissions. Sprint has submitted an affidavit stating that one month's average commissions

7

for LDCircuit is less than $75,000.   In response, LDCircuit contends that the liquidated damages provision does not apply because: (1) LDCircuit is seeking direct damages and this provision does not limit its recovery of direct damages; (2) it is unenforceable due to Sprint's willful and/or bad faith breach of the contract; and (3) it is unenforceable because it is contrary to the public policy embodied in the Kansas Salesperson Commission Statutes, K.S.A. §§ 44-341 *et seq.*   LDCircuit has submitted an affidavit stating that its average monthly commissions were $5,000 per month, and that it lost approximately twenty-one months' commissions resulting from Sprint's early termination of the contract, which would have resulted in damages of approximately $105,000.   The affidavit also asserts that LDCircuit is seeking an additional twelve months' commissions, which is another approximately $60,000, based on a separate provision in the Agreement which applies in the event of Sprint's termination "for convenience."

In essence, then, the parties are asking the court to address the merits of the limitation of liability provision in the contract because they raise legal and factual issues concerning the application and enforceability of this provision.   Under these circumstances, the court must first address the threshold issue of the degree to which the court may delve into the merits of this particular issue.

**A.      *Standard for Evaluating the Enforceability of a Contractual Damage Cap in Determining the Amount in Controversy***

Although the Tenth Circuit made reference to contractual limitations in *Woodmen of the World*, 342 F.3d at 1217 (noting that dismissal under the legal certainty standard may be

warranted "when a contract limits the possible recovery"), it has not been confronted with the issue of the extent to which the court can resolve the merits of the meaning and enforceability of a contractual damage cap on a Rule 12(b)(1) motion. On the one hand, one line of cases among the circuits seems to reflect the majority approach that the court must resolve this issue in its entirety, including making any disputed factual findings necessary to resolve the jurisdictional issue. Case law from the Second Circuit, on the other hand, suggests that liability caps are affirmative defenses on the merits that cannot be adjudicated on jurisdictional motions. The parties have not addressed this critical threshold issue at all. After thorough consideration of the various case law from the Courts of Appeal which arguably bears on this issue, the court concludes for the following reasons that the Tenth Circuit would follow the majority approach and require the court to address the merits of this issue in its entirety, including resolving all legal and factual issues necessary to a jurisdictional determination.

The court begins with an explanation of its hesitation on this issue. Beginning with a line of cases starting with *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199 (2d Cir. 1982), the Second Circuit has held that in determining whether a challenged jurisdictional amount has been met, district courts are permitted to assess the allegations in a complaint but must refrain from considering and adjudicating the merits of any asserted defenses. In *Zacharia*, the district court had dismissed the case for failure to satisfy the then-$10,000 amount-in-controversy requirement because a state statute limited the amount recoverable from the defendant hotel to only $1,000. *Id.* at 200-02. On appeal, the Second Circuit reversed, explaining that dismissal would contravene the rule that the existence of a valid defense does

not deprive a federal court of jurisdiction.  *Id.* at 202.  The court further found that for factual reasons the defendant hotel was not entitled to the benefit of the statutory damage cap in any event, and therefore the Second Circuit reversed the district court's decision.  *Id.* at 203.  The Second Circuit has affirmed this holding in cases such as *Ochoa v. Interbrew America, Inc.*, 999 F.2d 626 (2d Cir. 1993) (holding the district court's determination of the amount plaintiff could recover under a contract was erroneous), and *Scherer v. Equitable Life Assurance Society of United States*, 347 F.3d 394 (2d Cir. 2003) (holding the district court erred by using res judicata, which is an affirmative defense, to whittle down the amount in controversy).

In *Scherer*, the Second Circuit explained:

> This may seem paradoxical: if it can be said "to a legal certainty" that the defense in question is a winning defense, ought it not be considered for amount-in-controversy purposes?  One plausible answer is that because affirmative defenses can be waived, the court cannot *at the time of filing* be certain that any given affirmative defense will be applied to the case.  Given the time-of-filing rule, it follows that waiveable "affirmative defenses" are not germane to determining whether the amount-in-controversy requirement has been met.

*Id.* at 398 (emphasis in original).

This view seems to be consistent with the seminal case of *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938).  In *St. Paul Mercury*, the Supreme Court explained that the plaintiff's inability to ultimately recover the jurisdictional amount does not oust the court of jurisdiction, "[n]or does the fact that the complaint discloses the existence of a valid defense to the claim."  *Id.* at 289.  Thus, "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction."  *Id.* at 289-90.

10

Moreover, the Second Circuit's approach has a certain logical appeal, as illustrated by the facts of this case, which presents an example of why one might argue that the existence of a valid defense should not be deemed to defeat jurisdiction. Here, when LDCircuit commenced this lawsuit it very well may have had a good faith belief that, if Sprint invoked the limitation of liability provision, it would be able to raise colorable and legitimate arguments why the provision should not apply to limit its damages, including arguments that it has made here about contract interpretation. Therefore, at that time, the amount in controversy could be said to have likely exceeded $75,000. Whether LDCircuit would ultimately be able to recover this amount would of course depend on circumstances such as whether or not Sprint invoked the limitation of liability provision and, if so, whether the court would determine that there were any merit to LDCircuit's arguments why the limitation of liability provision was not applicable. If Sprint had decided not to assert the limitation of liability provision (which is a waivable defense) or if the court had determined that the provision was not enforceable, then LDCircuit theoretically would have been entitled to recover an amount well in excess of the $75,000 jurisdictional limit. Thus, it may seem anomalous (and contrary to *St. Paul Mercury*) for the court to find that although LDCircuit may have suffered damages well in excess of the jurisdictional limit and had a good faith belief that it might be able to recover those damages, that is insufficient to establish the requisite jurisdictional amount because, in the end, the contractual damage limitation applies.

Nonetheless, the Second Circuit's views on this issue represents the minority approach. In *Pachinger v. MGM Grand Hotel-Las Vegas, Inc.*, 802 F.2d 362 (9th Cir. 1986), the Ninth

Circuit expressly disagreed with the Second Circuit's holding in *Zacharia* and held that "in the few cases involving a rule or measure of damages that limits liability, we may go beyond the pleadings for the limited purpose of determining the applicability of the rule or measure of damages." *Id.* at 364 (holding a state statute much like the one at issue in *Zacharia* limited the plaintiff's recovery from the defendant hotel to $750 and consequently the amount-in-controversy requirement was not satisfied). Similarly, in *Valhal Corp. v. Sullivan Associates, Inc.*, 44 F.3d 195, *reh'g denied*, 48 F.3d 760 (3d Cir. 1995), the Third Circuit did not hesitate to delve into the issue of the enforceability of a limitation of liability provision. The Third Circuit found that the provision was enforceable and consequently vacated the district court's order to the contrary and remanded for the district court to dismiss the case for lack of subject matter jurisdiction. *Id.* at 209. Both *Pachinger* and *Valhal* involved district court opinions that resolved the enforceability of such damage limitations in the context of summary judgment motions.

Then, in *Pratt Central Park Ltd. Partnership v. Dames & Moore, Inc.*, 60 F.3d 350 (7th Cir. 1995), the Seventh Circuit addressed the applicable standard on a Rule 12(b)(1) motion where a $5,000 limitation of liability in the parties' contract arguably set the stakes well below the then-$50,000 jurisdictional minimum. The court devoted much attention to discussing public policy considerations relating to the manner in which federal courts should resolve such jurisdictional questions. Ultimately, the court observed that a district court has even broader discretion to resolve the issue on a motion to dismiss than it does on a motion for summary judgment because the court has factfinding power under Rule 12(b)(1) that it

lacks under Rule 56, and also because "a decision cast in jurisdictional terms does not foreclose renewal of the controversy in state court." *Id.* at 353. The court expressly adopted the approach of *Pachinger*, *Valhal*, and other similar cases and held that "a court has the *power* to dismiss for want of jurisdiction after deciding that a limitation-of-liability clause (or a state statute) caps damages at less than the jurisdictional amount." *Id.* (emphasis in original). Thus, under *Pratt Central*, a judge "may hear testimony and resolve conflicts to decide whether the parties' contract contains a particular clause limiting damages." *Id.* The court concluded that the district court did not abuse its discretion by determining on a Rule 12(b)(1) motion that the limitation of liability provision was enforceable and limited the plaintiff's recovery to $5,000, which was a jurisdictional issue that was logically distinct from whether the defendant breached its contractual duties. *Id.* at 354-55.[1]

This court projects that the Tenth Circuit would follow *Pratt Central* and hold that in a diversity case where the amount in controversy is challenged the district court must resolve the issue of the enforceability of a contractual damage cap on its merits on a Rule 12(b)(1) motion. The court reaches this conclusion, first, because it is consistent with the general standard for resolving Rule 12(b)(1) motions in this circuit. As discussed previously, such motions may take the form of a "facial challenge" or a "factual challenge" on subject matter jurisdiction. In a factual challenge case such as this one, the district court has wide discretion to hear evidence and resolve disputed jurisdictional facts. Here, the court's resolution of the

---

[1] The court also notes the well reasoned dissent in *Pratt Central*, which thoroughly discusses the most meaningful case law on this issue. *See id.* at 355-62 (Flaum, J., dissenting).

enforceability of the limitation of liability provision rests only on questions of law and disputed jurisdictional facts.   Hence, the court is not deviating from the "factual challenge" standard in resolving the motion.

Second, and perhaps more importantly, Tenth Circuit case law suggests that it would follow the majority approach on this particular issue.   For example, *Kalpakian v. Oklahoma Sheraton Corp.*, 398 F.2d 242 (10th Cir. 1968), involved an appeal that was identical in all material respects to *Zacharia*.   The district court had granted summary judgment and dismissed the case for lack of jurisdiction because an Oklahoma statute limited the defendant hotel's liability to $1,500, which was well below the then-$10,000 jurisdictional minimum.   Unlike the Second Circuit's opinion in *Zacharia*, however, the Tenth Circuit in *Kalpakian* did not hesitate to dismiss the case for lack of subject matter jurisdiction based on the statutory damage cap.   In doing so, the court found that the plaintiff's contentions that the damage cap did not apply were without merit.   *Id.* at 247.   Similarly, in *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221 (10th Cir. 2001), the Tenth Circuit affirmed the district court's order dismissing the case for lack of subject matter jurisdiction because the plaintiff's common law Wyoming tort claim was barred by the Colorado Workers' Compensation Act's exclusive remedy provision.   In *Stuart*, the Tenth Circuit did not hesitate to delve heavily into the parties' legal and factual disputes, fully resolving the issue of the applicability of the exclusive remedy provision.   *Id.* at 1225-31.

The court sees no material distinction for these purposes between a statutory damage cap as in *Kalpakian*, a statutory exclusive remedy provision as in *Stuart*, or the contractual

14

limitation of liability provision at issue in this case.  All involve limitations on the amount of damages recoverable by the plaintiff, and hence those types of limitations impact the determination of whether the amount-in-controversy requirement is satisfied.  In fact, in *Woodmen of World Life Insurance Society v. Manganaro*, 342 F.3d 1213 (10th Cir. 2003), the Tenth Circuit stated that dismissal under the legal certainty standard would be warranted "when a contract limits the possible recovery [or] when the law limits the amount recoverable," *id.* at 1217, thus suggesting that the Tenth Circuit probably would not recognize any type of meaningful distinction between statutory liability limits, on the one hand, and, on the other hand, contractual liability limits.  Consequently, after giving much consideration to this threshold issue, the court believes that it has the authority to fully resolve the issue of the enforceability of the contractual limitation of liability provision on the merits at this procedural juncture.

    **2.**    *Application of the Limitation of Liability Provision*

        **a.**    **Interpretation of the Provision**

The limitation of liability provision in the parties' Agreement that is at issue provides as follows:

> **Liability of Parties.**  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR LOSS OF PROFITS, ARISING FROM THE RELATIONSHIP OR THE CONDUCT OF BUSINESS UNDER THIS AGREEMENT.  LIABILITY OF SPRINT IN ANY AND ALL CATEGORIES, INCLUDING BUT NOT LIMITED TO MISTAKE, NEGLIGENCE, ACT OR OMISSION, INTENTIONAL ACTS, AND BREACH, SHALL NOT EXCEED IN THE AGGREGATE, ONE (1) MONTH'S AVERAGE COMMISSION PAID TO SALES AGENT.

Agreement ¶ 16 (capitalization in original).   LDCircuit argues that this provision does not, by its plain terms, limit Sprint's liability in this case.   LDCircuit contends that it is seeking direct damages resulting from Sprint's breach of contract; that the first sentence addresses only special, indirect, incidental, exemplary, or consequential damages, or loss of profits, and does not limit liability for direct damages; that the second sentence limits Sprint's liability to one month's average commission "in any and all categories"; and that this must be a reference to the categories of damages set forth in the first sentence, which does not include direct damages.

Under Kansas law, the construction of a written contract is a matter of law for the court. *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 511, 874 P.2d 659, 666 (1994).   "The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow."   *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan. App. 2d 30, 36, 926 P.2d 669, 674 (1996).   Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence.   *Simon v. National Farmers Org., Inc.*, 250 Kan. 676, 679-80, 829 P.2d 884, 887-88 (1992).   As an element of contractual construction, whether an instrument is ambiguous is a question of law for the court.   *Id.*   A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."   *Id.*   Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or

16

more possible meanings is the proper meaning." *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213, 1219 (1998).   The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists. *Arnold v. S.J.L. of Kan. Corp.*, 249 Kan. 746, 749, 822 P.2d 64, 67 (1991).

In this case, the limitation of liability provision unambiguously limits LDCircuit's recovery from Sprint on a breach of contract claim to one month's average commissions.   The first sentence of the provision is a limitation on the types of damages that the parties may recover—that is, they may not recover *any* special, indirect, incidental, exemplary, or consequential damages, or loss of profits from each other.   The first sentence does not, however, prohibit the parties from recovering other types of damages, such as direct damages, from each other.   The second sentence is the operative sentence here.   It limits the extent to which permissible types of damages (i.e., direct damages) may be recovered.   It provides, in clear and unmistakable language, that Sprint's liability, "in any and all categories, *including* . . . *breach*, shall not exceed in the aggregate one (1) month's average commission paid to [LDCircuit]" (emphasis added).   The "in any and all categories" verbiage in the second sentence does not refer to the categories of damages listed in the first sentence.   The first sentence already states that neither party has any liability for those types of damages, and therefore the second sentence would be completely meaningless if it were interpreted to mean that Sprint's liability for those types of damages were limited to one month's average commissions.   Rather, the "in any and all categories" addresses the types of claims ("including but not limited

to mistake, negligence, act or omission, intentional acts, and breach") for which Sprint's liability is limited to one month's average commission.

This interpretation is consistent with the various terms of the Agreement as a whole. The Agreement provides for a variety of payment alternatives in the event of termination. One of these is the situation involving Sprint's theory of the case, which is termination upon default. Sprint was entitled to terminate the Agreement "upon default" during the initial three-year term pursuant to subparagraph 14(b) of the Agreement. Under subparagraph 14(c)(iii), LDCircuit's failure to meet the required commissionable revenue levels would be considered a material breach constituting a default which would allow Sprint to terminate the Agreement. Under such circumstances, "[a]ll commissions [were] discontinued upon termination." Thus, if Sprint is ultimately correct that it validly terminated the Agreement pursuant to subparagraph 14(b), (c)(iii), then it owes LDCircuit no further commissions. On the other hand, if LDCircuit's theory of the case is correct, then Sprint breached the Agreement by terminating it during the initial three-year term. In the event of a breach, the limitation of liability provision applies and LDCircuit is entitled to recover one month's average commissions from Sprint.

The Agreement also provides one other alternative for LDCircuit to recover commissions following termination by Sprint. Subparagraph 14(c)(v) states that Sprint must pay LDCircuit commissions for a period of twelve months following termination of the Agreement if (among other things), Sprint terminates the Agreement pursuant to subparagraph 14(a). Subparagraph 14(a), in turn, is entitled "Termination for Convenience." It states:

18

> Except as otherwise provided herein, this Agreement is for an initial term of three (3) years from the effective date. *Neither party may terminate this Agreement during the Initial Term for convenience.* Thereafter, the Agreement shall remain in full force and effect until or unless terminated by either Party upon thirty (30) days written notice.

Agreement ¶ 14(a) (emphasis added).   The italicized sentence plainly states that Sprint could not terminate the Agreement for convenience during the initial term of the Agreement; rather, termination for convenience could only occur *after* the initial three-year term expired.   In this case, the initial three-year term had not yet expired.   Therefore, Sprint's termination of the Agreement cannot be regarded as a termination "for convenience" and LDCircuit is not entitled to an additional twelve months' commissions.   Rather, here, Sprint terminated the Agreement during its initial term.   As such, the termination was one of two things: it was either (1) a valid termination upon default pursuant to subparagraph 14(b), in which case LDCircuit is entitled to no recovery; or (2) a breach for which LDCircuit is entitled to recover.   If the termination was, in fact, a breach of the Agreement, then the limitation of liability applies and LDCircuit's recovery for direct damages is limited to one month's average commissions.

During the hearing on the motion, counsel for LDCircuit argued essentially that enforcing the limitation of liability provision renders the three-year initial term of the agreement meaningless.   Viewed from LDCircuit's perspective at this point in time, that may seem to be the case.   But, viewed from the perspective of the date on which the contract was entered into, that is far less clear.   There is no indication in the record that the Agreement was other than one negotiated at arms length by two knowledgeable business entities.   Why Sprint would have wanted to make any commitment to LDCircuit or why LDCircuit would have been

19

willing to enter into an agreement that limited Sprint's liability for breach would be speculation on the court's part.   But common sense would seem to indicate that both parties probably entered into the Agreement hopeful that during that first three-year term LDCircuit would prove itself to be a valuable asset to Sprint and that Sprint would have no reason to want to terminate the Agreement early.   Nonetheless, it does not seem inherently illogical that Sprint might have wanted to protect itself during that initial term in just the situation which has arisen here—a dispute over whether LDCircuit had defaulted—by limiting its liability if it were to be found in breach.   Thus, the court is entirely unpersuaded that the plain and unambiguous language of the limitation of liability provision is overridden by the fact that the Agreement was initially for a three-year term.

In sum, then, the plain language of the Agreement unambiguously limits Sprint's liability under the circumstances of this case to one month's average commissions.   LDCircuit nonetheless raises two arguments why the provision is unenforceable.   First, LDCircuit contends that Kansas courts will not enforce a limitation of damages clause in a contract arising from a party's willful misconduct under the contract.   Second, LDCircuit contends that the provision is contrary to public policy as embodied in the Kansas Commission Salesperson Statute.

### b.      Enforceability of the Provision

Under Kansas law, "contractual agreements limiting liability are valid if fairly and knowingly entered into" so long as the agreement is not illegal, unconscionable, *Corral v. Rollins Protective Servs. Co.*, 240 Kan. 678, 681-82, 693, 732 P.2d 1260, 1263, 1271

20

(1987), or contrary to public policy, *Talley v. Skelly Oil Co.*, 199 Kan. 767, 772-75, 433 P.2d 425, 430-31 (1967).   Here, LDCircuit does not argue that the provision is unconscionable. Absent any legal or factual argument from LDCircuit on this issue, then, the court has no basis from which it could conceivably find that the provision is unenforceable due to its unconscionability.

LDCircuit's argument, instead, is that Sprint's conduct in terminating the Agreement was unjustified and done in bad faith, and that Kansas courts will not enforce a limitation of damages clause in a contract arising from a party's willful misconduct under the contract. LDCircuit is correct that any term in a contract that attempts to limit liability for gross negligence or willful or wanton conduct is unenforceable.   *Wolfgang v. Mid-Am. Motorsports, Inc.*, 898 F. Supp. 783, 788 (D. Kan. 1995); *Butler Mfg. Co. v. Americold Corp.*, 835 F. Supp. 1274, 1282 (D. Kan. 1993).   But Sprint correctly points out that this rule of law only applies to tort claims, not to LDCircuit's breach of contract claim.   Kansas courts have addressed the standards for the enforceability of such provisions  in breach of contract claims, and those standards are set forth previously (i.e., enforceable if fairly and knowingly entered into and not illegal, unconscionable, or contrary to public policy).   The line of cases to which LDCircuit refers are those in which parties were attempting to enforce such exculpatory clauses against tort claims.   *See, e.g.*, *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 582 P.2d 1111 (1978) (negligence claim).   Indeed, this is the principle embodied in the Restatement (Second) of Contracts § 195 (1981) (cited briefly by the Kansas Supreme Court in *Corral*), which addresses the enforceability of  contractual terms exempting parties from

21

"tort liability" caused intentionally, recklessly, or negligently.   Moreover, Kansas courts do not recognize the tort of bad faith breach of contract.   *See, e.g.*, *North Central Kansas Production Credit Association v. Hansen*, 240 Kan. 671, 675, 732 P.2d 726, 731 (1987) (Kansas does not recognize the tort of bad faith); *Kiley v. Petsmart, Inc.*, 32 Kan. App. 2d 228, 234, 80 P.3d 1179, 1183 (2003) (affirming trial court's grant of summary judgment on claim for bad faith breach of contract).   Thus, insofar as LDCircuit is seeking to avoid the impact of the provision on the basis of Sprint's willful misconduct, that argument only pertains to the enforceability of the provision against tort claims.

During the hearing, counsel for LDCircuit specifically stated that he was relying on the case of *Wille v. Southwestern Bell Telephone Co.*, 219 Kan. 755, 549 P.2d 903 (1976). *Wille*, however, is consistent with the court's holding on this matter.   The plaintiff in *Wille* (a heating and cooling business) had purchased listings in the defendant's yellow pages telephone directory, and the defendant had omitted the plaintiff's new telephone number from some of the listings.   Once the plaintiff learned that its telephone number had been omitted, the plaintiff began advertising in alternative forms of media at a total cost of four to five thousand dollars. The plaintiff sought to recover those expenses from the defendant under breach of contract and negligence theories, but the defendant asserted that under the terms of the advertising contract its liability was limited to the cost of the advertisement.   The plaintiff challenged the enforceability of this limitation of liability provision.   In evaluating this issue, the Kansas Supreme Court devoted much attention to whether the provision was unconscionable and ultimately determined that it was not.   *Id.* at 757-65, 549 P.2d at 905-11.   The court then

22

observed that "[t]here is no indication here either of gross negligence or wilful or wanton conduct in the omission of [the plaintiff's] listing and he asserts nothing beyond simple neglect." *Id.* at 764, 549 P.2d at 911.  It is this quotation upon which LDCircuit relies.  This reliance, however, is misplaced.  The court's statement in this regard does not mean that any plaintiff who can allege a willful breach of contract can avoid the impact of a limitation of liability provision on a breach of contract claim.  Such a rule of law would significantly undercut the enforceability of such provisions.  Rather, the court's statement is consistent with the principle, discussed previously, that a plaintiff with a valid tort claim may be able to overcome a contractual limitation of liability provision in the appropriate circumstances.  In this case, however, LDCircuit has no such tort claim and therefore the limitation of liability provision is enforceable.

LDCircuit also contends that the provision is unenforceable on grounds of public policy because it is contrary to the Kansas  Commission Salesperson Act (the Act), K.S.A. §§ 44-341 to 44-347.  "The public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial decisions." *Petty v. City of El Dorado*, 270 Kan. 847, 854, 19 P.3d 167, 172 (2001).  Because LDCircuit points to a statutory provision, then, its argument might arguably have some merit in appropriate circumstances involving unpaid commissions.  Under the facts of this case, however, it is clear that the type of commissions that LDCircuit is seeking to recover do not fall within the purview of the Act.  Under the Act, "whenever a principal discharges a commission salesperson . . . the principal shall pay . . . the commission salesperson's commissions earned through the last day of the contractual

23

relationship." K.S.A. § 44-342(a). "Commissions earned through the last day of the contractual relationship" is defined as "commissions with respect to services or merchandise which actually has been delivered or furnished to, accepted by and paid for by the customer by the last day of the commission salesperson's contractual relationship." *Id.* § 44-341(b). In this case, Sprint discharged LDCircuit in March of 2003. Under the Act, then, LDCircuit would only have been due commissions on Sprint services or merchandise which had actually been furnished to, accepted by, and paid for by LDCircuit's customers. LDCircuit has not made any suggestion in the record currently before the court that any such commissions were unpaid by Sprint. Rather, the damages at issue in this case are post-termination commissions. As such, LDCircuit's claims are not even arguably governed by the Act.

In sum, the court finds that the limitation of liability provision at issue in this case is valid and enforceable against LDCircuit's breach of contract claim. Thus, LDCircuit's recovery on its breach of contract claim is limited to one month's average commissions. The evidence currently before the court reflects that LDCircuit's recurring commissions at the time of termination were approximately $5,000 per month, and therefore this is the amount in controversy on this aspect of LDCircuit's breach of contract claim.

## II. **Attorneys' Fee Provision**

LDCircuit also contends that it is entitled to recover its attorneys' fees in this action. Its argument in this regard is based on an indemnification provision in the parties' Agreement. This provision states as follows:

24

> **Indemnification.**   Each Party shall indemnify, defend and hold harmless the other Party from and against any and all liabilities (including reasonable attorney fees) resulting from the actions of the indemnifying Party (or its employees or agents) hereunder.   This indemnification shall include, but not be limited to, breach of any provision of this Agreement, misrepresentation of Sprint Service or prices, and unauthorized or illegal acts of the indemnifying Party, its employees or agents *or* arising from or brought by third parties, including customers, or prospective customers, resulting from Sales Agent's performance, or failure to perform, any obligation under the Agreement, including the failure to disclose Sales Agent's relationship with Sprint.

Agreement ¶ 18 (emphasis added).   Sprint contends that this is an indemnification provision and, consistent with the general nature of such provisions, it only applies to claims brought by third parties.   LDCircuit, on the other hand, focuses on the italicized word "or."   It contends that the second sentence requires indemnification for "breach of any provision of this Agreement . . . of the indemnifying Party" *or* for actions "arising from or brought by third parties."

The court has grave doubts about the possibility that LDCircuit will be able to recover its attorneys' fees under this indemnification provision.   The court, however, declines to resolve this interpretational issue because LDCircuit has failed to provide the court with sufficient evidence of the amount in controversy on its attorneys' fee claim in any event. Given the approximately $5,000 value on plaintiff's breach of contract claim, LDCircuit would need to be seeking approximately $70,000 in attorneys' fees in order to meet the jurisdictional minimum.   The affidavit that LDCircuit provided in response to Sprint's motion fails to place *any* estimated value on its attorneys' fee claim.   At the hearing on the motion, counsel for LDCircuit stated that LDCircuit had incurred approximately $20,000 in attorneys' fees thus

far, and that LDCircuit would continue to incur fees for additional discovery, final pretrial, and trial. Ultimately, though, counsel failed to place an estimated value on the attorneys' fee claim. Significantly, then, LDCircuit has failed to produce any evidence to suggest that it had, at any time, a good faith belief that it would be able to recover $70,000 on its attorneys' fee claim. The court might be willing to infer a reasonable estimate in calculating the amount in controversy. *Cf. Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1340 (10th Cir. 1998) (holding $50,000 amount-in-controversy requirement was satisfied where plaintiff asserted a damage claim of $41,028.51 plus $6,854 in attorneys' fees to date; court could not say that it would be unreasonable to expect plaintiff to incur an additional $2,117.50 in attorneys' fees considering the realities of modern law practice and the complexities of the case); *Gerig v. Krause Publications, Inc.*, 58 F. Supp. 2d 1261 (D. Kan. 1999) (where amount in controversy was $52,504.20-$63,404.50, augmented by reasonable attorney fees, it was not clear to a legal certainty that plaintiff's recovery would be less than the $75,000 threshold). The court is not, however, willing to infer that $70,000 in attorneys' fees would be reasonable on a $5,000 breach of contract claim.

Accordingly, LDCircuit has failed to establish that it does not appear to a legal certainty that it cannot recover at least $75,000 on its breach of contract claim. This claim therefore fails to satisfy the jurisdictional minimum.

### III.  Tortious Interference Claim

In order to establish the required amount in controversy, then, LDCircuit must establish that it is not legally certain that it cannot recover $75,000 on its claim for tortious

interference with prospective business relations.  The answer to this question hinges in part on whether LDCircuit has such a cause of action here.  Whether the Tenth Circuit would have this court fully resolve that issue on a 12(b)(1) motion is less clear than for the matter of the application of the contractual damage limit.  But, the court believes that this case is one like *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221 (10th Cir. 2001),[2] in which, under the facts here, plaintiff simply does not have the cause of action to be pled.  Thus, the legal impossibility of recovery is so certain that it negates LDCircuit's good faith[3] in asserting the claim and amounts to "an obvious abuse of federal court jurisdiction."  *Woodmen of World Life Ins. Society v. Manganaro*, 342 F.3d 1213, 1217 (10th Cir. 2003) ("'The legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith

---

[2] The Tenth Circuit's decision in *Stuart* rested on the conclusion that the plaintiff had *no* cause of action in tort because of the applicability of the Colorado Workers' Compensation Act's exclusive remedy provision, not merely that the plaintiff's damages were limited to a certain amount.  *See, e.g.*, *id.* at 1225 (noting that there are cases where the court will not take jurisdiction unless the plaintiff has asserted a claim cognizable in state courts).  In this case, the court is likewise holding that LDCircuit has no tortious interference claim that would be cognizable in state court.

[3] By this, the court is not implying that LDCircuit did not have a subjective good faith belief that its tortious interference claim would satisfy the amount-in-controversy requirement.  What the court means by this is that it recognizes the plaintiff's claim controls the amount-in-controversy determination so long as that claim "is apparently made in good faith."  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938).  Where the plaintiff's right of recovery is uncertain, then, doubt is resolved in favor of the plaintiff's subjective good faith.  *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994).  But a plaintiff's subjective belief alone is not the controlling factor when it is legally certain that the plaintiff cannot recover the jurisdictional amount.  *Id.*  Good faith also has an objective element.  *Id.*  Thus, where the legal impossibility of recovery is certain, it is said that this legal certainty "negates" the plaintiff's good faith (meaning the plaintiff's subjective good faith) in asserting the claim.

in asserting the claim.'" (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994))).

Under Kansas law, the elements of a claim for tortious interference with a prospective business advantage are: "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by the defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 424, 77 P.3d 130, 151 (2003). Thus, one of the essential elements of LDCircuit's tortious interference claim is that Sprint must have engaged in intentional misconduct that interfered with LDCircuit's prospective business with its customers. LDCircuit's tortious interference theory is that Sprint failed and refused to provide LDCircuit with needed information and sales support, and this precluded LDCircuit from signing up new customers and earning commissions.[4] Thus, the alleged "intentional misconduct" is Sprint's failure to provide

---

[4] During the hearing, counsel for LDCircuit stated that its tortious interference claim was also predicated in part on the theory that Sprint was advising LDCircuit-enlisted customers in a manner that cast LDCircuit in a bad light. But the only communication between Sprint and LDCircuit-enlisted customers alleged in the complaint is that Sprint told those customers that LDCircuit would no longer be their Sprint representative and that they should work directly with Sprint going forward. *See* Compl. (doc. 1) ¶¶ 40, 53, 59, at 7, 9, 10. LDCircuit did not plead this "bad light" theory in the complaint, it has not sought leave to amend its complaint to assert this new theory, and, perhaps most importantly, it has presented no evidence from which the court can attempt to value this claim for purposes of making the amount-in-controversy determination. In fact, counsel for LDCircuit admitted during the hearing that

information and support.   Certainly, though, Sprint had no independent legal duty, aside from

the parties' contractual arrangement, to provide LDCircuit with this information and support.

The only colorable basis for this claim, then, is that Sprint had a contractual duty to provide

LDCircuit with this information and support.   It is well established, however, that as a general

proposition "the existence of a contractual relationship bars the assertion of tort claims

covering the same subject matter governed by the contract."   *Horizon Holdings, L.L.C. v.

Genmar Holdings, Inc.*, 24 F. Supp. 2d 1123, 1151 (D. Kan. 2002) (citing *Atchison Casting

Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1461 (D. Kan. 1995), and noting the cases cited

therein).   Thus, additional tort duties may not be imposed where the parties' duties and rights

are already specifically defined by contract.   *Id.*; *see also Atchison*, 889 F. Supp. at 1461

("Where the parties contemplate a remedy in the event of breach, and the provisions of the

contract cover the consequences of default, the bargained-for existence of a contractual

remedy displaces the imposition of tort duties.").   In this case, Sprint's obligation to provide

LDCircuit with information and support, if any, arose from the parties' contractual

relationship, and this contractual relationship bars the imposition of additional tort duties.

Accordingly, LDCircuit's tortious interference claim is patently without merit.   *See, e.g.*,

*Curtis 1000, Inc. v. Pierce*, 905 F. Supp. 898, 903 (D. Kan. 1995) (granting summary judgment

on claim for tortious interference with prospective business relations where the defendant's

alleged violation of the parties' agreement was the misconduct which formed the basis of the

---

LDCircuit's damages under this theory were "relatively minor."

plaintiff's claim).  Simply put, then, the facts show that plaintiff has no cause of action under Kansas law for tortious interference against Sprint and, as in *Stuart*, the court has no subject matter jurisdiction.

LDCircuit's tortious interference claim also fails to establish subject matter jurisdiction for yet another reason—that is, LDCircuit has failed to provide the court with a damage estimate on this claim.[5]  As a noteworthy starting point, LDCircuit's complaint does not pray for any particular amount of damages on the tortious interference claim, and it does not seek punitive damages on this claim.  The prayer for damages on this claim simply seeks compensatory damages.  Moreover, LDCircuit's affidavit does not address the extent of its alleged damages on its tortious interference claim.  Instead, the affidavit only addresses the average monthly commission amount and the number of months for which those commissions should have been payable.  Those amounts, however, are LDCircuit's alleged contractual damages.  During the hearing, counsel for LDCircuit candidly admitted that the damages that LDCircuit was seeking on its tortious interference claim are the same as those that it is seeking on its breach of contract claim.  But LDCircuit's average monthly commissions under the contract would be irrelevant to the measure of damages on its tortious interference claim.

_____

[5] The court recognizes that the limitation of liability provision probably would not limit LDCircuit's recovery on a valid tortious interference claim.  Although the provision purports to limit liability for "intentional acts," such exculpatory liability clauses are generally unenforceable as to intentional torts, Restatement (Second) of Contracts § 195(1), presumably such as tortious interference.  Thus, the amount in controversy with respect to plaintiff's tortious interference claim likely would be LDCircuit's full measure of damages.  But, as discussed below, LDCircuit has failed to provide the court with any measure of damages on this claim.

The measure of damages on the tortious interference claim would be the value of the business that LDCircuit actually lost by virtue of Sprint's so-called interference with LDCircuit's relationship with its customers—i.e., that LDCircuit was unable to finalize contracts with X, Y, and Z and consequently lost commissions that it had anticipated earning on those contracts. LDCircuit has not attempted to place any meaningful value on this lost business.[6]  *Cf. Gibson v. Jeffers*, 478 F.2d 216, 221 (10th Cir. 1973) ("Although allegations in the complaint need not be specific or technical in nature, sufficient facts must be alleged to convince the district court that recoverable damages will bear a reasonable relation to the minimum jurisdictional floor."); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 291 (1938) (party invoking federal court jurisdiction "knows or should know" whether the party's claim satisfies the jurisdictional amount).   Thus, LDCircuit has failed to provide the court with any evidence from which the court can attempt to evaluate the amount in controversy on its tortious interference claim.   Accordingly, even if LDCircuit did have a cause of action for tortious interference, LDCircuit has nonetheless failed to meet its burden of establishing that it does not appear legally certain that LDCircuit is not entitled to recover more than $75,000 on that claim.

---

[6] This failure further undercuts the notion that this claim was asserted in good faith and provides yet additional evidence that LDCircuit is trying to displace its contractual remedies with tort remedies which, as discussed above, it cannot do.

**IT IS THEREFORE ORDERED BY THE COURT** that Sprint's motion to dismiss (doc. 14) is granted.  This case is dismissed for lack of subject matter jurisdiction.

**IT IS SO ORDERED** this 8th day of April, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge